UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:   Adam M. Madigan,                          Case No. 15-31545
                                                   Chapter 7
                              Debtor.

---

          Straight Line, LLC, Jeffrey E. Barber,
          Jean B. Barber, Emily J. Barber,
          Paul T. Barber, and
          Bethany A. Barber,
                              Plaintiffs,          Adv. Proc. No. 16-50002

               v.

          Adam M. Madigan,

                              Defendant.

---

Appearances:

James F. Selbach, Esq.                             *for Plaintiffs*
Selbach Law Firm, PLLC
290 Elwood Davis Road, Suite 290
Liverpool, NY 13088

Peter A. Orville, Esq.                             *for Defendant*
Orville & McDonald Law, PC
30 Riverside Drive
Binghamton, NY 13905

**Memorandum-Decision and Order**

Plaintiffs Jeffrey E. Barber, Jean B. Barber, Emily J. Barber, Paul T. Barber and Bethany
A. Barber (the "Barbers") and Straight Line LLC ("Straight Line") seek a declaration of
nondischargeability regarding their claims against Debtor/Defendant Adam M. Madigan on
grounds of fraud and willful and malicious injury pursuant to 11 U.S.C. § 523(a)(2) and (a)(6).[1]

---

[1] All sectional references are to Title 11 of the United States Code, 11 U.S.C. §§ 101-1532
("Bankruptcy Code" or "Code"), unless otherwise noted.

Debtor answered in general denial.[2] The court conducted a trial on July 26 and 27, 2017. At the

conclusion of Plaintiffs' case, Debtor's counsel moved to dismiss all counts of the complaint on

which the court reserved decision. Following the filing of post-trial briefs, the matter was deemed

submitted.[3] This memorandum-decision incorporates the court's findings of fact and conclusions

of law as permitted by Fed R. Civ. P. 52(a)(1), made applicable by Fed. R. Bankr. P. 7052.

For the reasons which follow, the court finds that portion of the debt consisting of Straight

Line funds which Debtor converted and embezzled to be nondischargeable under § 523(a)(4) and

(a)(6). The court further finds the balance of Plaintiffs' claims to be dischargeable and, as to those

claims, grants Defendant's motion to dismiss.

---

[2] The pleadings in this matter include: (i) Amended Complaint (Doc. 9) with attached exhibits A through D, (ii) Answer (Doc. 12), (iii) Stipulation regarding undisputed facts and admissibility of the following exhibits which were subsequently introduced and received at trial: Straight Line Floor Plan Financing and Security Agreement (Ex. B), Piaker & Lyons' Independent Accountants' Report on applying agreed-upon procedures (Ex. C), Straight Line Unconditional Guaranty for Joe's Garage (Ex. F), Straight Line Floor Plan Financing and Security Agreement for Joe's Garage (Ex. G), Guilty Plea Transcript – People v Adam M. Madigan (Ex. H), Earnings Statement dated 4/29/2011 (Ex. I), Report of deposited floor plan payments 1/1/14-12/31/14 (Ex. J), Returned check for $132,895.00 from Berkshire Properties Corp (Ex. K), and Record of purchases-Joe's Garage and RJC Trading 2014 (Ex. L) (Doc. 27).

[3] In addition to the aforementioned stipulated exhibits, the evidentiary record consists of the following Plaintiffs' exhibits: Confession of Adam Madigan dated February 25, 2015 (Ex. N), Post-it note created by Adam Madigan (Ex. O) and Pre-Trial Statement by Adam Madigan (Ex. P); the following Defendant's exhibits: Lines of Credit and Personal Guarantees for Joe's Garage and RJC Trading backed by Joseph and Chauncy Strevell (Ex. 1), Age of Deposited Floor Plan Payments (Ex. 2), Summary of Purchases and payments by Joe's Garage and RJC Trading (Ex. 3), testimony of (i) Emily Barber, (ii) William Dengler, (iii) Al Stage, (iv) Terry Depew, (v) Connie Foley, (vi) Deanna Mincer, and (vii) Adam McCauley as recorded in the transcript of the July 26, 2017 proceedings (Doc. 45)("Trans. 7-26"); testimony of (i) James Schweiger; (ii) Joseph Dabroski; (iii) Jeffrey Barber; (iv) Jean Barber; (v) Debtor Adam Madigan; and (vi) Clayton Miller as recorded in the transcript of the July 27, 2017 proceedings (Doc. 46)("Trans. 7-27").

Additionally, the court takes judicial notice of Debtor's chapter 7 petition and schedules—Doc. 1 in the main case, 15-31545 ("Petition" and "Schedules").

**Jurisdiction**

The court has jurisdiction to hear and decide this core proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1), and (b)(2)(I).

**Factual Findings**

The following facts are largely undisputed except as otherwise noted.

Debtor Adam M. Madigan filed a chapter 7 petition on October 23, 2015. Included on his Schedule F—Creditors Holding Unsecured Non-Priority Claims—were: (i) Bethany Barber, Emily Barber, Kate Barber, and Paul Barber, with the amount of the claim listed as "unknown;" (ii) Jeffrey and Jean Barber with a claim listed at $140,000; and (iii) Barterra Properties LLC, State Line Auto Auction, Inc. ("State Line"), and Straight Line. The foregoing unquantified debts represent losses suffered by Plaintiffs during the course of Debtor's employment with State Line. The $140,000 debt represents a purported loan from Jeffrey and Jean Barber to Debtor for his purchase of a house.

State Line is a family-owned wholesale auto auction business started in 1981 by Jeffrey Barber's father in Waverly, New York.[4] It is the largest auto auction business in New York State, with an average inventory of 1,300 vehicles and weekly sales of up to 900 vehicles. In 1997 the Barbers formed Straight Line to complement State Line's business by offering dealers access to lines of credit to enable them to spend more money at auction.[5] Straight Line's sole business is to provide floor plan financing for dealers who buy vehicles at State Line auctions.[6]

---

[4] Jeffrey Barber owns 40% of State Line and is its manager and president. His children, Paul, Kate, Emily and Bethany Barber, each own 15% of State Line and work for the company.

[5] Jeffrey and Jean Barber each own 24% of Straight Line and their four children each own 13%.

[6] Floor plan financing refers to a short-term lending relationship in which a third-party lender purchases inventory from a wholesaler on behalf of a retailer. When the inventory is sold, the wholesaler collects principal, interest and fees from the retailer.

In October 2008, Jeffrey Barber hired Debtor to work at State Line.  Mr. Barber knew Debtor from his early youth, when Debtor attended the Waverly schools with his daughters.  He also knew Debtor's parents and both sets of his grandparents.  Debtor graduated college and had worked for a few years at Citizens & Northern Bank—where the Barbers maintained their business accounts—before beginning work at State Line. The following spring, Jeffrey Barber assigned Debtor to work on Straight Line matters.[7]  He did so with the intent to groom Debtor to eventually assume the position held by James Schweiger, the long-time credit manager who had been with the business at its inception and was set to retire at the end of the year. As part of the responsibilities of the position, a credit manager performs credit checks on current and prospective customers, sets customer credit limits, tracks and manages titles, and releases those titles upon a dealer's sale of the financed vehicles.  In January 2010, after approximately eight months in training under Mr. Schweiger's tutelage, Debtor acceded to the role of credit manager.  He held that position until he resigned five years later.

### Straight Line Floor Plan Financing

Straight Line floor plan financing normally worked as follows.  A dealer who wanted to finance vehicles purchased at auction would first submit an application to open a credit line. Jeffrey Barber would then approve the upper limit of a new dealer's credit line.  Once approved, a dealer who successfully bid at auction would take the auction paperwork associated with the vehicle(s) to the Straight Line office to set up financing.  The credit manager would then check the dealer's outstanding borrowing against his approved credit limit and, if the credit manager determined that the dealer had not exceeded the approved credit limit, would approve the financing

---

[7] Straight Line has no employees.  State Line employees run the business of Straight Line. Trans. 2-27 60:15-16.

and authorize Straight Line to pay State Line in full for the vehicles. For each vehicle, Straight Line would then retain in a file the vehicle's title together with a blank, signed check obtained from the dealer. The dealer could then take physical possession of the vehicles and move them to a retail location. As vehicles were sold, the dealer would call Straight Line to request the title from the credit manager and authorize the deposit of the signed check, which Straight Line then completed for the amount due. The amount due was the sum of the amount financed plus a set fee based upon the number of days that the loan was outstanding. Contemporaneously (or soon thereafter), the credit manager would deposit the check and issue title to the dealer. Mr. Schweiger testified to the importance of having a separate check for each vehicle financed by Straight Line in order to minimize the occurrence of bounced checks. He explained that one check covering the purchase of multiple cars has a better chance of bouncing than individual checks of smaller amounts covering each individual vehicle purchase. Mr. Schweiger further testified that he usually made single bank deposits on Mondays and Wednesdays and two bank deposits on Fridays, the day that auctions were held.

There were limited exceptions to the floor plan financing protocol. Occasionally, a dealer required a title in hand to close on a pending sale and receive payment. In such cases, Straight Line could loan the dealer the physical title ("title loan") for a finite period in advance of payment to Straight Line, subject to return of the title to Straight Line if the sale did not go through. Mr. Schweiger testified that during his tenure there were only three dealers approved to receive such title loans. The procedure followed for such a title loan was simple. Mr. Schweiger testified that he would make a copy of the title, record on the copy the name of the borrowing party and date, and keep a log of outstanding title loans. When the dealer paid for the vehicle, the log entry was stricken. Mr. Schweiger kept the log to ensure that he did not lose track of titles. He further

testified that every week he conducted an audit to confirm that he had a copy of each title and check with its corresponding paperwork, referred to as a block ticket.

Under normal circumstances, until a third-party sale occurred, Straight Line retained ownership of its vehicles. As a security measure, Straight Line periodically conducted physical inspections of dealer lots to confirm that its financed vehicles were present in accordance with the terms of its floor plan contracts.

Debtor's performance of his duties as Straight Line's credit manager deviated significantly from how he was trained by Mr. Schweiger. Debtor testified that he stopped making deposits on Fridays and made them only on Mondays and Wednesdays. He testified that he did not run credit checks on every customer. His proffered excuse was that the system used was "outdated." Debtor testified that he discontinued the historical log system employed to track title loans. Instead of consistently photocopying the title and recording the title loan on the log maintained, he would note the title release date directly on the block ticket and then keep the block ticket in the dealer's file. This alternative system required that Debtor review each dealer's file to comprehensively determine what titles were out on loan, rather than being able to simply refer to a central log. Debtor admitted that under his system he did not have 100% certitude as to all outstanding title loans. Jeffrey Barber testified that Debtor failed to charge dealers the proper fees and, in many cases, failed to charge any fees at all, thus permitting the dealers to finance cars at little to no cost. There was corroborative testimony from New York State Trooper Dengler that Debtor had admitted to police that he waived fees for certain dealers.

### Third-Party-Actors Joseph and Chauncy Strevell

Two brothers, Joseph and Chauncy Strevell (the "Strevells"), operating under the name Joe's Garage, began purchasing vehicles at State Line auctions in March 2013. They initially

6

purchased vehicles with cash, *i.e.,* either with their own money or through third-party financing. Soon thereafter, Jeffrey Barber granted them a one-week "float," which enabled the Strevells to take possession of titles one week before State Line processed their payments. The Strevells claimed that this float was required to accommodate their receipt of delayed payments from a dealer in North Carolina, Credit Union Auto Buying Services ("Auto Buying Services"), to whom they were selling numerous vehicles.

After four months of frequent purchases, the Strevells' business, "Joe's Garage," entered into a floor plan financing agreement with Straight Line that provided a $200,000 credit line. Jeffrey Barber and Debtor set the credit line, which was supported by a $200,000 unconditional guaranty signed by the Strevells. Joe's Garage proceeded to purchase numerous vehicles over several months through a combination of Straight Line floor plan financing and outside sources of funding. Similar to the arrangement with State Line, the one-week float privilege was extended to vehicles financed by Straight Line. Thus, under ordinary circumstances, Debtor would release titles to the Strevells when notified that a sale had occurred and, approximately a week later, would complete and deposit checks held in the Strevells' file.

Just one month after the Strevells began doing business with Straight Line and prior to making any payments, Debtor allowed the Strevells to substantially exceed their $200,000 credit limit. Ex. 3. By the end of 2013, Joe's Garage had financed 136 vehicles, made payments totaling $1,350,451, and owed Straight Line $609,205. Ex. 3 and Ex. C.

In early 2014, the Strevells began to finance cars through Straight Line for a second entity--RJC Trading. There is no evidence that Debtor ever established a credit line, performed a credit check on RJC Trading, or required the Strevells to sign a floor plan financing agreement and

unconditional guaranty when RJC Trading became a Straight Line customer. Nor was any evidence presented that Debtor increased the credit line and guaranty for Joe's Garage.

The evidence does show that Debtor routinely released titles to the Strevells in advance of payment to Straight Line. The Strevells would purchase vehicles from State Line and State Line would be not be paid until one week later by Straight Line. Similarly, when the Strevells sold a vehicle, they would authorize Debtor to deposit the related check one week after Debtor sent them the title. Debtor testified that he would make the authorized deposit between five and seven days after he sent titles to the Strevells.

At no time during the two-year period in which the Strevells had an active business relationship with Straight Line, did Debtor disclose to Plaintiffs that Joe's Garage was consistently purchasing vehicles far in excess of its credit limit and that there was neither credit line documentation nor a guaranty in place for RJC Trading. Likewise, Debtor never apprised Plaintiffs that he was releasing titles to the Strevells in advance of payment. This was the case despite weekly management meetings at which managers, such as Debtor, reported to Plaintiffs and others on what was happening in their respective departments.

Not only did Debtor fail to proactively volunteer information to Plaintiffs concerning the anomaly that was the Strevells' credit situation, he also failed to respond fully to direct inquiries made by Jeffrey Barber in March, April and May 2014 about the Strevells. (Trans. 7-27 76:17-21. Jeffrey Barber testified that during that time period he approached Debtor numerous times regarding the Strevells and asked him "Are those guys okay?" to which Debtor regularly responded that "They pay like clockwork." Trans. 7-27 76:22-77:11. Jeffrey Barber testified that he intended his question in a general sense to elicit the type of generic information and input one would expect

to receive from a credit manager beyond whether the Strevells were making payments for cars. Trans. 7-27 77:12-21.

The record reflects that the Strevells ultimately paid for all vehicles financed through Straight Line that they had obtained at auctions conducted through March 21, 2014. Trans. 7-26 74:9-13, Trans. 7-26 229:21-230:5, Ex. C. The Strevells paid $609,205 owed by Joe's Garage as of year-end 2013 by the end of January 2014. Ex. C. During the first six months of 2014, the Strevells financed an additional 262 vehicles and paid Straight Line in excess of $4.5 million, which presumably included the balance owed for 2013.[8] Ex. 3. Throughout this time, the longest that the Strevells ever went without making a payment to Straight Line was 14 days. Ex. 3. Yet, the ongoing payments were for vehicles that had been purchased weeks or months before. Trans. 7-27 81:9-17; Ex. 2.

All business with the Strevells ceased in May of 2014, when an auto auction owner in Connecticut informed Jeffrey Barber that the Strevells appeared to be legal risks. That information prompted a floor plan check at Auto Buying Services' lot in North Carolina, where many of the vehicles financed by Straight Line were located. The expected vehicles were present, but Auto Buying Services represented that it had already paid the Strevells for the vehicles. From that information, Jeffrey Barber deduced that the Strevells were not promptly paying Straight Line with funds received on sales of Straight Line vehicles. Emily Barber testified that upon realizing that

---

[8] Sources of information quantifying the Strevells' debt are contradictory. Defendant's Exhibit 3 is a list of payments made by the Strevells to Straight Line, prepared by Debtor's counsel, which indicates that at the end of 2013, the Strevells owed $697,399. However, Plaintiffs' Exhibit C, a report prepared by accountants Piaker and Lyons, indicates that $609,205 was due on that date. Similarly, the list of payments in Defendant's Exhibit 3 do not reflect that the 2013 balance was fully paid in January 2014, but both Exhibit C and the accountant's testimony indicate that it was. Trans. 7-26 228:18-229:5. Where these documents conflict, the court credits the accountant's report and testimony regarding payments received by Straight Line.

the Strevells were well above their credit limit, Jeffrey Barber went to their place of business and demanded that the Strevells sign a financing agreement and credit guaranty for RJC Trading and an increased line of credit and guaranty for Joe's Garage "for what we thought they owed us." Trans. 7-26 99:16-24. The newly executed agreements dated May 23, 2014, set credit limits of $500,000 for RJC Trading and $700,000 for Joe's Garage. Ex. 1. Although the Strevells signed the contracts, they never purchased vehicles from State Line again nor did they make good on outstanding debts. Within days, a single $132,895 check drawn on the account of RJC Trading and deposited by Straight Line bounced.

*Debtor's Cover-Up*

Jeffrey Barber testified that he repeatedly asked Debtor how much the Strevells owed Straight Line, to which Debtor initially responded "$300,000." Three months later, however, Debtor represented to the New York State Police that the amount owed was "$990,375." This latter amount was also understated as Debtor later admitted that this statement to the New York State Police was a deliberate lie that he knew to be false at the time. Trans. 7-27 205:3-6.

During the three-month period between lying to Jeffrey Barber and lying to the State Police, Debtor falsified Straight Line's business records in order to make the losses appear smaller. He did so in several ways, most notably by removing 19 vehicles valued at $452,875 from Straight Line's books. Debtor later pled guilty to 19 misdemeanor counts of falsifying business records under the § 175.05 of the New York Penal Code. For his conviction on these counts, Debtor is currently paying $23,000 in criminal restitution.[9]

---

[9] The $23,000 of criminal restitution is automatically nondischargeable under § 523(a)(7) and is not the subject of this adversary proceeding.

Debtor also altered Straight Line's 2014 year-end accounts receivable report to conceal the $452,875 shortfall. Debtor's falsification of the books and records did not elude the attention of the outside accountants, who noted irregularities during their year-end reconciliation. Upon performing an audit, the accountants discovered Debtor's deliberate falsification of the business records and determined that the Strevells had converted 78 vehicles financed through Straight Line with a value of $1,500,580 that were purchased at auction between March 28 and May 23, 2014.

*Debtor's Release of Titles in Advance of Payment by the Strevells*

Plaintiffs eventually learned that Debtor had released titles in advance of payment to some of the 78 vehicles that were converted by the Strevells. This occurred at a time when Joe's Garage had far exceeded its credit limit and there were no established credit terms for RJC Trading. Emily Barber testified that other than the 37 titles to vehicles sold by the Strevells to Auto Buying Services, Plaintiffs were unable to locate any of the remaining 41 titles. Trans. 7-26 44:12-15, Trans. 7-26 75:15-20.

Debtor testified that he released nine titles upon receiving authorization by the Strevells to deposit the $132,895 check drawn on RJC Trading's account.[10] This check subsequently bounced. Debtor further testified that he released 19 titles upon authorization by the Strevells to deposit a total of $452,875 in checks covering 13 purchases on Joe's Garage account and 6 on RJC Trading's account.[11] Ex. P at 5, Trans. 7-27 226:1-5. Debtor testified that he should have made the deposit during the first few days of June. Trans. 7-27 319:14-18. Debtor further stated that he never made

---

[10] Contrary to established procedure, Debtor did not have nine checks of smaller denominations for each of the nine vehicles, but instead processed one larger check to cover multiple vehicles.
[11] The alleged checks total $532,875, $80,000 more than the $452,875 deposit Debtor claims the Strevells authorized. Debtor has not explained the $80,000 discrepancy, other than to suggest that his attorney erred when describing the checks in Debtor's signed pre-trial statement. Trans. 7-27 230:5-23.

the $452,875 deposit. Trans. 7-27 283:6-20. In his further testimony, Debtor admitted that he never even completed the pre-signed checks or prepared a deposit slip. Trans. 7-27 321:10-15. Debtor attempts to explain this glaring error by saying he made a "mistake"—a mistake he never brought to Plaintiffs' attention and later covered up by falsifying Straight Lines' business records. Trans. 7-27 224:17, Trans. 7-27 283:6-20. The Debtor's explanation is not tenable. Debtor admits that he knew of his failure to make the deposit by the end of June 2014, but did nothing about it. Trans. 7-27 283:16-20, Trans. 7-27 284:10–6.

Debtor's further explanation is that in light of the $132,895 check that bounced on or about June 2, 2014, Jeffrey Barber instructed him not to deposit any pre-signed checks drawn on the Strevells' account for the total money owed. Trans. 7-27 230:24–233:7. Debtor implies that this justified his failure to make the deposit. Jeffrey Barber refutes this testimony. He testified that he spoke with Debtor about the pointlessness of depositing the $132,895 check that had already bounced, but that he never told the Debtor not to deposit the two checks that totaled $452,875. Trans. 7-27 176: 1-20. Debtor's testimony on this point is not credible. Debtor's nine months of on-the-job training under Mr. Schweiger would have underscored the better practice of making multiple, smaller deposits on the theory that smaller check amounts would be more likely to clear a dealer's account. Furthermore, the $132,895 bounced check was issued from the Strevells' RJC Trading account, but Straight Line held two checks for the $452,875 deposit—one from RJC Trading and the other from Joe's Garage, which had not bounced any checks up to that point.

It took Debtor a full week to produce the 37 titles for vehicles sold by the Strevells to Auto Buying Services. Debtor testified that the Strevells never requested those 37 titles from him and that the titles never left his office. Trans. 7-27 241:9-17, Trans. 7-27 175:1-11. Despite Straight Line's possession of these titles, Auto Buying Services successfully asserted a claim of ownership

to the 37 vehicles. As a result, Straight Line suffered a loss of $621,380, the value of the 37

converted vehicles.[12]

Debtor testified that there were at least two other titles for vehicles that the Strevells had

sold to other wholesalers that never left the business premises. Trans. 7-27 236:6-13, Trans. 7-27

250:8-24. Debtor never addressed the remaining eleven titles that went missing.

*Authority to Extend Title Loans*

Testimony diverged over what authority, if any, Debtor had to loan out titles. Jeffrey

Barber, Emily Barber and James Schweiger testified that there were standing policies generally

forbidding release of titles in advance of payment, but that a subset of two to four dealers who had

a long history with Straight Line were explicitly granted the unusual privilege of title loans in

advance of sale. Trans. 7-26 17:9-11 Trans. 7-27 13:5-11. Trans. 7-27 67:11-68:23. Emily Barber

testified that only Jeffrey Barber could grant those privileges. Trans. 7-26 17:1-4.

Debtor's testimony directly contradicted Plaintiffs' testimony on this issue. Debtor

testified that he had significant discretion over title release policies, that no established policy or

written procedures existed, and that no set list of customers eligible for title loans existed. Trans.

7-27 308:4-5 Trans. 7-27 246:7-248:13. Debtor testified that he made title loans to more than 90%

of Straight Line customers. Trans. 7-27 245:12-246:1. After weighing the testimony and assessing

the credibility of the witnesses as to company policy on lending out titles, the court finds that

Debtor's testimony deviates so significantly from the undisputed floor plan financing process that

the court cannot credit it. In light of the obvious importance of Straight Line's retention of title

---

[12] In the ordinary course of business, a title is necessary to transfer vehicle ownership. However, as a good faith purchaser, Auto Buying Services prevailed over Straight Line pursuant to U.C.C. § 2-403(1)(d). That section provides that a good faith purchaser in receipt of goods under voidable title may receive good title notwithstanding that the seller acquired the goods or title through fraud punishable as larcenous under the criminal law.

documents pending receipt of payment, the court finds Debtor's testimony self-serving and gives it no weight. The court accepts Plaintiffs' testimony that release of titles in advance of payment was, by policy, an exception to an understood rule. James Schweiger's testimony about Debtor's on-the-job training credibly establishes that Debtor must have been aware that his regular release of titles to the Strevells, in advance of payment, at a time when they had far exceeded any existing credit line, was a material deviation from previous policies and Plaintiffs' expectations as to what was required of him on the job.

### Debtor's Theft of Cash

Debtor admits that he kept "$800 to $1,000" cash he had received from dealers for fees owed to Straight Line and, in one instance, a small cash overpayment. Trans. 2-27 243:11-23. Plaintiffs contend that Debtor diverted far more cash than that. New York State Trooper Dengler testified that Debtor admitted that he would keep cash received from customers or dealers that paid for fees or cars in cash. Trans. 7-26 144:20–145:8.

Plaintiffs' witness, Al Stage, a dealer who financed vehicles through Straight Line and was a close friend of the Barbers, testified that he paid Debtor approximately $17,500 in cash in 2011 and 2012 for three vehicles. Trans. 7-26 164:1-165:25, Trans. 7-26 170:1-171:25. Jeffrey Barber testified that when he reviewed Straight Line's records following Debtor's departure, those three vehicles appeared on the books as unpaid. Trans. 7-27 99:19-25. Plaintiffs allege that Debtor stole the money Al Stage claims to have paid. Trans. 7-27 329:19-25. Debtor testified that no such cash payments were ever received from Mr. Stage and characterized the claim as "absurd." Trans. 7-27 244:2-3.

Comptroller Joe Dabroski testified concerning a financial account that raised suspicion as to Debtor's involvement. Trans. 7-27 39:6-44:12. Debtor reported a $500 balance due on a

14

personal loan extended to an employee, while the accounts receivable clerk reported that the amount due was $800 based on her records. *Id.* Mr. Dabroski searched the records and presented his findings—that the amount due was $800 rather than the $500 Debtor claimed was due. *Id.* Mr. Dabroski then offered Debtor assistance and access to the reports that he had reviewed. *Id.* In response, Debtor became uncomfortable, short with him and expressed displeasure. *Id.* Mr. Dabroski testified that he offered to go through a spreadsheet that Debtor claimed to have for the employee's loan and reconcile it against the accounting books and reports, but Debtor refused to produce the spreadsheet, and rejected Mr. Dabroski's offer. *Id.* Debtor never reconciled the reported $300 discrepancy. *Id.*

*Debtor's Personal Financial Transactions with Plaintiffs*

Jean Barber is sole owner of Barterra Properties, LLC ("Barterra"), a business that owned a large, undeveloped parcel of land. In 2011, Jeffrey and Jean Barber decided to develop the parcel. They proposed that Debtor become the resident owner of the model home, which Barterra would construct. Once completed, Debtor was to buy the home, contingent on obtaining a mortgage in an amount that would be sufficient to repay Barterra's costs. Debtor responded with interest, but said his outstanding student loan debt would negatively affect his credit and ability to obtain such a mortgage. To address this concern, Jeffrey Barber directed State Line to pay Debtor a $19,400 bonus, an amount sufficient to satisfy Debtor's student loan debt (the "Bonus"). Ex. I. Instead of repaying his student loans and without Jeffrey Barber's knowledge, Debtor used the Bonus to purchase a truck and home appliances. Debtor testified that it made more sense to purchase the truck for cash and eliminate a monthly vehicle expense that would have been two to three times the amount of his monthly student loan payment. Ultimately, Debtor qualified for a mortgage on the house of only $255,000, far less than the $390,000 asking price. To close the

transaction, the Barbers accepted the proceeds of the $255,000 mortgage and separately agreed to have Debtor reimburse the balance of the purchase price in the future. Plaintiffs and Debtor did not agree to payment terms nor memorialize the debt. It was not until two years later, when Debtor resigned from his position with Straight Line that he signed a promissory note in favor of the Barbers for the shortfall.

## Analysis of Legal Claims

The Amended Complaint broadly pleads 12 counts—a § 523(a)(2) and § 523(a)(6) claim for each of the Plaintiffs, with each claim based upon the same allegations. At the conclusion of Plaintiffs' case in chief, Defendant moved the court to dismiss the § 523(a)(6) claims as to the $1.5 million loss. In response, Plaintiffs' counsel limited the § 523(a)(2) claim to the $1.5 million dollar loss and asserted that the § 523(a)(6) claim was for the "theft of cash," which includes (i) the $800 to $1,000 in cash Debtor admitted to stealing; and (ii) the $17,500 account receivable that Mr. Stage testified that he had paid Debtor, but which Straight Line records showed as still owing.[13]

At the conclusion of the trial, Defendant's counsel moved the court to dismiss all claims and requested the court to not consider Mr. Stage's testimony as to the $17,500 cash allegedly paid by Mr. Stage to Debtor as such evidence was outside the issues raised in the pleadings. In response, Plaintiffs' counsel moved the court to amend the pleadings to conform to the evidence pursuant to Fed. R. Civ. P. 15(b)(2). Because Mr. Stage was introduced as a witness and presented testimony

---

[13] On the record, Plaintiffs' counsel clarified that "the § 523(a)(2) claim is limited squarely to the $1.5 million. The § 523(a)(6) claim is related exclusively to the theft of first the $800 to the $1,000 .... We also believe that he stole the money from those three cars that were testified to by Mr. Stage. So we're not claiming that the [$]1.5 [million] is the willful and malicious. It's the theft of the cash that's the willful and malicious. As far as the (a)(2) claim, we do have two components of the fraud. We have the, for lack of a better word, the missing deposits fraud and then we have the initial fraud which was that [Defendant] knew full well that these individuals were getting far, far and ahead. And when [Jeffrey] Barber asked him are they okay, he lied to them." Trans: 7-27 329:19-330:19.

16

as to the $17,500 without objection by Debtor's counsel, his testimony is part of the record and the court, accordingly, grants Plaintiffs' motion and amends the pleadings to conform to the evidence presented.  Accordingly, the court also considers the $300 discrepancy in the outstanding account receivable from an employee as part of Plaintiffs' claim under Code § 523(a)(6).

Thus, as identified by Plaintiffs' counsel, the court finds that the only claims to be considered are (i) whether the $1.5 million loss suffered by Plaintiffs is nondischargeable under § 523(a)(2)(A) and (ii) whether the $800 to $1,000 taken by Debtor, the $17,500 allegedly paid by Mr. Stage to Debtor and the $300 discrepancy in the employee's account payable is nondischargeable under § 523(a)(6).  The court notes that Plaintiffs' limitation of its claims to the foregoing excludes claims concerning the Bonus paid to Debtor and additional consideration alleged to be owing on the house.  Accordingly, the court will not address these claims arising from personal transactions with the Plaintiffs.  It is clear to the court, however, that had these particular claims been pressed, the evidence adduced at trial would not support a finding of nondischargeability under any provision of § 523.[14]

---

[14]Regarding the Bonus, under all subsections of § 523(a), a necessary element is whether a debt exists that can be held nondischargeable.  The Code defines "Debt" as "liability on a claim."  Code § 101(12).  In order to qualify as a "claim," there must be a "right to repayment."  Code § 101(5).  The court finds that the Bonus paid to Debtor through State Line's payroll system did not create a debt.  Facially, the transfer was not a loan, and did not impose a repayment obligation on Debtor.  The record before the court does not show that the Bonus was in the nature of a debt.  The fact that Jeffrey Barber intended for the Debtor to use money given to him for a specific purpose does not change the Bonus into a loan for which the Plaintiffs had an expectation of repayment.

As to the purported "loan" made by Plaintiffs at the closing on Debtor's home, the record does not reflect that Debtor made a false representation in either written or verbal form.  No closing statement is in evidence.  Without any evidence to document that the sale price was greater than the cash and mortgage proceeds paid at closing, the Statute of Frauds would seem to preclude oral proof of the same.  Therefore, grounds for finding this debt nondischargeable under either § 523(a)(2)(A) or 523(a)(2)(B) are not present.  Plaintiffs have not shown that Debtor had subjective intent not to repay them at the time the obligation was created or, further, that his actions were sufficiently inexplicable to qualify as malicious.  Recklessness, building a house he could not

*Plaintiffs' § 523(a)(2)(A) Claim*

Section 523(a)(2)(A) excepts from discharge debts:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by—
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

Section 523(a)(2)(A) contains three independent causes of action—false pretenses, false representation, and actual fraud—each of which must be established by proof of the different elements. *In re Scialdone*, 533 B.R. 53, 58 (Bankr. S.D.N.Y. 2015). Plaintiffs bear the burden to prove each element in support of finding a debt nondischargeable by a preponderance of the evidence. *See Grogan v. Garner,* 111 S.Ct. 654, 659-60 (1991). "To be actionable, the debtor's conduct must involve moral turpitude or intentional wrong; mere negligence, poor business judgment or fraud implied in law (which may exist without imputation of bad faith or immorality) is insufficient." *In re Schwartz & Meyers*, 130 B.R. 416, 422 (Bankr. S.D.N.Y. 1991) (citing 3 L. King, COLLIER ON BANKRUPTCY, ¶ 523.08 at 523–45 (15th ed. 1990)).

The U.S. Supreme Court "has historically construed the terms in § 523(a)(2)(A) to contain the 'elements that the common law has defined them to include.'" *Husky Intern. Elecs., Inc. v. Ritz*, 136 S.Ct. 1581, 1586 (2016) citing *Field v. Mans*, 516 U.S. 59, 69 (1995). To establish a fraud claim under federal common law, a plaintiff must prove (i) debtor made a material false representation, (ii) *scienter*: debtor made the representation knowing of its falsity, (iii) debtor acted with intent to defraud plaintiff, (iv) plaintiff justifiably relied on the false representation and (v)

---

afford, and agreeing to repay a sum he did not have, does not meet the narrowly construed intent requirement of the statute. *Kawaauhau v. Geiger*, 523 U.S. 57, 64 (1998).

plaintiff suffered damages that were the proximate cause of plaintiffs' reliance. Restatement
(Second) of Torts 1976 ("Restatement") §§ 525, 546 and 548A. However, as the United States
Supreme Court recently enunciated in *Husky*, "[t]he term 'actual fraud' in § 523(a)(2)(A)
encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a
false representation." *Husky Intern. Elecs. Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016). Because
Plaintiffs' claims under § 523(a)(2) are premised upon actual fraud based upon Debtor's alleged
misrepresentations and falsified business records, the court's analysis will include each of the five
elements of common law fraud.

Plaintiffs' complaint alleges that Debtor was operating in concert with the Strevells to
defraud them by, among other things, providing titles with no expectation of payment and keeping
Plaintiffs in the dark about the details of the Strevells' business transactions with Straight Line.
Plaintiffs allege that Debtor's failure to fully respond to Jeffrey Barber's inquiries as to whether
the Strevells were "okay" kept them unaware (i) of the extent to which Joe's Garage had exceeded
its credit limit, (ii) that RJC Trading was not subject to a credit limit, (iii) that the Strevells had not
executed guaranties of the RJC Trading debt and (iv) of Debtor's habit of releasing titles to the
Strevells in advance of payment. Plaintiffs allege that they relied upon Debtor to inform them of
these circumstances and the attendant risk of loss and that Debtor's failure to do so resulted in their
inaction to constrain their lending to the Strevells and repossess vehicles, which was the proximate
cause of their $1.5 million loss. The benefit to Debtor, Plaintiffs allege, was the ability to keep his
job and protect his reputation.

Plaintiffs' second claim under § 523(a)(2)(A) is based upon Debtor's misrepresentations
to Plaintiffs, specifically to Jeffrey Barber, about the amount owed by the Strevells. The alleged
misrepresentations include Debtor's (i) confessed falsification of business records to conceal for

seven months the full extent of the losses caused by the Strevells, (ii) failure to disclose that he had not made a $452,875 deposit and (iii) conflicting statements as to the Strevells' liability, represented to be $300,000 to Plaintiffs and $960,000 to the State Police. Plaintiffs allege that these acts and omissions caused their $1.5 million loss. The court will examine these two claims in turn.

Plaintiffs argue that Debtor's statement that the Strevells "pay like clockwork" satisfies all five elements of fraud: (i) Debtor's representation was false, (ii) Debtor knew it was false, (iii) Debtor intended that Plaintiffs rely on the misrepresentation, (iv) Plaintiffs did justifiably rely on his misrepresentation; and (v) Plaintiffs' reliance was the proximate cause of their damages.

Preliminarily, the court interprets the scope of Jeffrey Barber's inquiry as to whether the Strevells were "okay" as greater than merely questioning whether the Strevells were paying regularly. Debtor, in his role as credit manager, should have understood that Jeffrey Barber was soliciting information from his credit manager of not only whether payments were being made, but also what the bigger picture entailed—*i.e.,* seeking feedback of anything that would inform a credit risk assessment. Thus, the court rejects the contention that Debtor fully responded by his answer. On the other hand, there is no evidence before the court that Debtor was conspiring against the Plaintiffs or acting in concert with the Strevells against their interests and so the court rejects any theory of Plaintiffs' case that would have the court draw that inference.

The record reflects that Jeffrey Barber inquired of Debtor concerning the Strevells on numerous occasions in March, April and May 2014. Based on Plaintiffs' Exs. 2 and 3, the court finds that the Strevells purchased between four and 14 vehicles every week between August 9, 2013 and March 21, 2014—a period of 36 consecutive weeks. The Strevells paid for all of the vehicles purchased by the Strevells during this 36-week period. Trans. 7-26 229:21-230:5. During

20

the following eight-week period, from March 28 through May 23, 2014, the Strevells purchased

between 16 and 23 vehicles each week except on May 23, 2014, when the Strevells purchased two

vehicles. The loss suffered by Plaintiffs accrued during this eight-week period, attributable to

vehicles purchased at weekly auctions on March 28 through May 23, 2014. The first indication

that the Strevells were not good for their purchases was in late May 2014 when Auto Buying

Services asserted an ownership interest in the 37 vehicles. Days later, the $132,895 check

bounced.

Based upon the above timeline, Debtor's response appears to have been factually accurate,

limited though it may have been. The record shows that from July 2013 through June 11, 2014,

Straight Line regularly received payment on the Strevells' account not more than 14 days apart,

thus supporting this court's finding that Debtor's representation to Jeffrey Barber that the Strevells

"paid like clockwork" was truthful. Ex. 3. However, under well-established principles of tort law,

a wholly truthful statement can qualify as a fraudulent misrepresentation if "the maker knows or

believes [the statement] to be materially misleading because of his failure to state additional or

qualifying matter[s]." Restatement § 529. As previously stated, the court finds that Debtor failed

to fully respond to Jeffrey Barber's inquiry. The question now becomes whether Debtor knew or

believed his answer to be materially misleading because of his choice not to disclose fully the

Strevells' tenuous credit situation.

Debtor testified that setting credit limits was one of his job responsibilities. Debtor further

testified that he knew the Strevells were over their credit limit. Debtor was well aware that he was

violating company policy of (i) holding a dealer to his credit limit and (ii) releasing titles only after

payment. The court infers from the evidence that Debtor knew his partial response to Jeffrey

Barber's inquiries was materially misleading. Plaintiffs have established the first and second elements of their first § 523(a)(2)(A) claim.

To establish the third element of their claim, Plaintiffs must prove that Debtor intended for Jeffrey Barber to rely on his statements. Debtor knew that his misconduct as a credit manager would be evident if he was to fully inform Jeffrey Barber of the Strevells' situation and that his employment and reputation would be in jeopardy. Debtor testified that Jeffrey Barber would have "been concerned" if Debtor had disclosed to him that the Strevells were over their credit limit and in possession of titles that Debtor had released to them in advance of payment. The court finds that Debtor intended for Jeffrey Barber to rely on his partial response so that Debtor could retain his job and reputation.

The fourth element the court considers is reliance. The United States Supreme Court held in *Field v. Mans* that § 523(a)(2)(A) requires that a creditor's reliance be both actual and justifiable, not reasonable. 516 U.S. 59, 74-6 (citing Restatement § 537). The inquiry of a creditor's reliance is a subjective one. *Id.* at 71 (citing Restatement § 545A, Comment *b.*)) "[A] person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id.* at 70 (citing Restatement § 540). However, justifiable reliance is not limitless. *Id.* at 71. One is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." Restatement § 541, Comment *a.*

The record supports a finding of actual and justifiable reliance. It is clear that Plaintiffs relied upon Debtor to perform his job responsibilities consistent with his training and company policies. Part of Debtor's job entailed keeping dealers within set credit limits, properly vetting the

22

credit worthiness of potential new dealers, obtaining proper credit line documentation and releasing titles after payment. The court finds that Plaintiffs actually and justifiably relied upon Debtor to communicate information relevant to Plaintiffs' oversight of the business operations and, therefore, actually and justifiably relied upon Debtor's misrepresentation concerning the Strevells. Although Plaintiffs might have ascertained the falsity of Debtor's representation had they consulted the auction records and asked pointed questions of Debtor, Debtor was their credit manager and was the ready source of facts about the Strevells' credit accounts. It was Debtor's job to be on top of the very issues he hid from them and Plaintiffs were justified in relying upon their credit manager to perform the core responsibilities attendant to the position: monitoring credit risks and apprising Plaintiffs of the same.

Causation—the final element addressed by the court—"is composed of cause in fact and legal cause." *In re Goguen*, 691 F.3d 62, 68 (1st Cir. 2012) (analyzing causation in the context of a Code § 523(a)(2)(A) claim). Initially, the court rejects any suggestion by Plaintiffs that they may establish this element through Defendant's admissions at trial that he did in fact cause Plaintiffs' loss. The court considers Defendant's statements for what they are worth, but does not find them to be beyond rebuttable proof of causation of Plaintiffs' damages.[15]

The United States Supreme Court in *Field* looked to the Restatement for guidance to inform its analysis of reliance under Code § 523(a)(2)(A). *Field*, 516 U.S. at 70. This court follows that

---

[15] At trial Defendant was asked by Plaintiffs' counsel "And Straight Line, LLC and the Barbers were damaged by your deception; were they not? Defendant answered "Yes." Plaintiffs' counsel asked "And they were damaged in the sum of $1.5 million? Defendant answered, "Sounds about right." Trans. 7-27 221:21-25. Plaintiffs' counsel went on to ask Defendant "You deceived [Jeffrey Barber]. You committed fraud; didn't you? Defendant answered "If that's your definition of fraud, then yes." Trans. 7-27 263:3-5.

lead and looks to the Restatement for guidance in its analysis of causation. The Restatement at §

546 makes the following statement about "Causation in Fact:"

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss
> suffered by one who justifiably relies upon the truth of the matter misrepresented,
> *if his reliance is a substantial factor in determining the course of conduct that
> results in his loss.*

Restatement § 546 (emphasis added). The Restatement at § 548A provides the following

concerning "Legal Causation of Pecuniary Loss":

> A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from
> action or inaction in reliance upon it *if, but only if, the loss might reasonably be
> expected to result from the reliance.*

Restatement § 548A (emphasis added). The Second Circuit has held that "in New York, as in any

other state whose common law accords with the view of the Restatement, liability is determined

by whether the plaintiff justifiably relied upon the defendant's misrepresentations and suffered a

loss that reasonably might have been anticipated to result from the reliance." *Gordon & Co. v.

Ross*, 84 F.3d 542, 545 (2d Cir. 1996). "[I]t must be established that defendant's act was a cause-

in-fact of an injury if there is to be a recovery. This principle requires a plaintiff to establish,

beyond the point of speculation and conjecture, a factual, causal connection between its losses and

a defendant's actions." *Aegis Ins. Svcs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 179 (2d. Cir.

2013) (examining causation under New York tort law).

Thus, under these guiding principles, to establish causation in fact Plaintiffs must show

that their justifiable reliance on Debtor's misrepresentation (i) was a substantial factor in shaping

their course of conduct, *i.e.,* failure to repossess vehicles, call back title loans and shut down

borrowing, and (ii) this course of inaction resulted in their loss. In other words, but-for Debtor's

failure to alert Plaintiffs of the reality of the Strevells' credit risk, Plaintiffs would have exercised

24

valuable remedial options that would have prevented the conversion of the 78 vehicles and thus, the resultant loss.

Jeffrey Barber testified that had Debtor made him aware of the full truth, he would have curtailed lending to the Strevells and repossessed vehicles. Emily Barber testified more vaguely that had Plaintiffs known the full truth, they would have acted differently. It is always easier with 20/20 hindsight to lay out a course of conduct that could have been followed. The record is devoid, however, of any evidence to support a finding of a point in time at which any remedial actions taken by Plaintiffs would have prevented or even mitigated their loss. Without those facts in evidence, the court cannot find that Debtor deprived Plaintiffs of a valuable remedial action, or, said another way, that Plaintiffs' course of conduct (inaction) resulted in their loss.

Many alternative scenarios could have unfolded where either Plaintiffs would not have engaged in remedial actions or remedial actions would not have stemmed the loss. For instance, Plaintiffs' response to the full truth in 2013, a point in time when the Strevells had a smaller amount of outstanding debt, may have been to simply increase the credit line for Joe's Garage. Contrast that point in time with early February 2014, when the Strevells' debt was paid in full. Then, Plaintiffs might have simply required proper loan documentation for RJC Trading and increased the credit line for Joe's Garage. And, during the eight-week period during which the loss was incurred, perhaps at that point Plaintiffs would have shut down further purchases and attempted to repossess cars. Missing, however, is whether remedial actions taken at any given point in time would have had any value and succeeded to any extent to stem the loss. The court cannot speculate that at a particular point in time between March 28 and May 23, 2014, Plaintiffs would have acted to do something that would have prevented their loss.

In fact, the record reflects that at the end of their business relationship with the Strevells, Plaintiffs made two fruitless attempts to limit their exposure. Plaintiffs immediately inventoried their vehicles on the lot of Auto Buying Services and yet were unsuccessful in asserting an ownership interest in vehicles for which they held titles. Similarly, at a time when Jeffrey Barber knew that the Strevells were "bad actors," Plaintiffs merely obtained increased security guaranties and a line of credit agreement for RJC Trading, measures that also had no ultimate value towards stemming their loss. Based on Emily Barber's testimony, it appears that at that time, Plaintiffs believed the Strevells' debt to be $1.2 million according to the aggregate lines of credit extended on or about May 23, 2014. Contrary to Jeffrey Barber's testimony that had he been fully informed about the Strevells he would have repossessed vehicles, Plaintiffs notably presented no evidence that they made any attempt to recover physical possession of any vehicles still in the custody of the Strevells.

It is not for the court to guess at whether at each unidentified point in time that Debtor gave Jeffrey Barber an incomplete response that Plaintiffs had valuable collection remedies available which they abstained from employing in reliance upon Debtor's misrepresentation. For even when Plaintiffs knew of the Strevells' duplicitous conduct and attempted to repossess vehicles for which they held titles, they still suffered a loss due to the intervening actions of the third party.

Further, the court does not find that the self-serving statements by Plaintiffs about their hypothetical conduct, made with the benefit of hindsight, are sufficient to meet their burden of proof. Plaintiffs have failed to show that their reliance on Debtor's fraudulent misrepresentation was a substantial factor in determining their inaction to curtail lending and repossess vehicles. Nor, that their inaction led to their loss. For all of the foregoing reasons, Plaintiffs have not established causation in fact.

Nevertheless, the court will continue its analysis of causation by examining legal cause. "[Legal cause is largely a question of foreseeability—a concept that 'shape[s] and delimit[s] a rational remedy; otherwise the chain of causation could be endless.'" *In re Goguen,* 691 F.3d at 69 citing *Sys. Mgmt., Inc. v. Loiselle,* 303 F.3d 100, 104 (1st. Cir. 2002). In order to establish legal cause, Plaintiffs must prove that Debtor reasonably might have anticipated that the loss suffered by Plaintiffs would result from their reliance on his misrepresentation. *Gordon & Co. v. Ross,* 84 F.3d at 545. The court must consider whether it was reasonably foreseeable by Debtor that his misrepresentation to Jeffrey Barber would lead to the Strevells' conversion of 78 vehicles and loss of $1.5 million.

> As explained by Second Circuit Court of Appeals Judge Friendly:

> With the aid of hindsight one can also say that a prudent man, carefully pondering the problem, would have realized that … events might transpire as they did. But such post hoc step by step analysis would render 'foreseeable' almost anything that has in fact occurred; if the argument relied upon has legal validity, it ought not be circumvented by characterizing as foreseeable what almost no one would in fact have foreseen at the time.

*In re Kinsman Transit Co.,* 338 F.2d 708, 723 (2d Cir.1964) (Friendly, J.).

The court finds from the evidence before it that Debtor could not have reasonably foreseen that his misrepresentation to cover his negligent conduct of duties as a credit manager would open the door for nefarious actors such as the Strevells to steal $1.5 million from his employers. The court finds that Debtor could and probably did reasonably anticipate that had Plaintiffs known of Debtor's failure to follow company protocol as laid out in the instructions received from James Schweiger or exercise a modicum of common sense, that they would have fired him. There is little doubt that Debtor's negligence gave rise to a situation (i) where the Strevells were significantly beyond the credit limit set for Joe's Garage, (ii) there was no credit limit set for RJC Trading nor any guaranty in place, (iii) titles were haphazardly loaned without adherence to company policy

and proper tracking, (iv) deposits were not made and (v) proper fees were not charged. But this Debtor-created situation did not cause the Plaintiffs' loss. Had the Strevells continued to pay, Plaintiffs would have suffered no loss regardless of Debtor's negligent performance of his job duties.[16] Plaintiffs have not shown that Debtor's misrepresentation led to their loss and that their loss might reasonably have been expected to result from Plaintiffs' reliance.

The concept of legal cause "stems from policy considerations that serve to place manageable limits upon the liability that flows from negligent conduct." *Derdiarion v. Felix Contracting Corp.*, 51 N.Y.2d 308, 314 (1980). The court finds that it would cut against important policy considerations to hold Debtor liable for $1.5 million, an amount disproportionate to his culpability, especially in light of the criminal acts of the Strevells. To hold a debtor liable under circumstances present here would be to travel a path that has no sensible stopping point.[17]

For the reasons discussed above, Plaintiffs have not established that Debtor's misrepresentation was the legal cause of Plaintiffs' loss. Plaintiffs' first § 523(a)(2)(A) claim fails and will be dismissed.

The court now turns to Plaintiffs' alternative claim under § 523(a)(2)(A). The court finds that Debtor's admitted deletion of 19 vehicles from the Straight Line computer system, his

---

[16] It bears noting that Plaintiffs continued to receive payments from the Strevells throughout the eight-week period during which the Strevells purchased the 78 vehicles they would eventually convert to the detriment of Plaintiffs.

[17] Reasoning by analogy, were a bank employee to negligently leave a vault unlocked and lie to their employer about the error, that lie could not reasonably be considered the legal cause of the loss suffered when a third party robbed the vault through the unlocked door. The injury is too out of proportion to the employee's misrepresentation, and to hold otherwise would overly burden employees for third-party misconduct, would allow employers to fraudulently pursue remuneration from employees rather than appropriate third-party bad actors, and there would be no reasonable stopping point to the employee's liability. Furthermore, the court notes that holding employees personally liable for the conduct of third parties, even where they lie to their employers about their conduct, would wrongly absolve employers of their responsibility to supervise adequately their employees.

admitted falsification of payment information relative to those vehicles and his preparation of a false 2014 year-end report constitute false representations by Debtor and that Debtor knew they were false. The court further finds that Debtor made the false representations with intent to deceive Plaintiffs. Further, the court finds that for approximately seven months Plaintiffs actually and justifiably relied on the false business records until the end-of-year audit showed that their reliance was misplaced.

Again, however, the causal connection between Plaintiffs' reliance and $1.5 million of damages is not established. As discussed *supra*, Plaintiffs bear the burden of showing that Debtor's misrepresentation was both causation in fact and legal cause of their loss. Debtor falsified the business records and year-end report and lied about the scale of loss to cover up the losses that had already occurred. For that reason alone, Plaintiffs cannot show that the misrepresentation caused the $1.5 million loss. But-for Debtor's falsification of the business records and year-end report and failure to disclose the fact that he had not made the $452,875 deposit, Plaintiffs would still have suffered the $1.5 million loss, as it had already occurred. Debtor's cover up of the losses was not a substantial factor in determining any course of conduct that led to the loss. As previously stated, the loss had already occurred. Accordingly, Plaintiffs' claim under § 523(a)(2)(A) is denied and will be dismissed.

### Plaintiffs' § 523(a)(6) Claim

Section 523(a)(6) bars discharge of debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." The term "willful" in this context means "deliberate or intentional." *In re Stelluti*, 94 F.3d 84, 87–88 (2d Cir. 1996). The intention required is an intention to cause injury, not just an intent to perform the act—reckless or negligent harm stemming from deliberate conduct does not qualify. *Kawaauhau v. Geiger*, 523 U.S. 57, 57

29

(1998). The term "malicious" means wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will. *In re Stelluti*, 94 F.3d 84, 87. Malice may be constructive or implied, and may be demonstrated "by the acts and conduct of the debtor in the context of [the] surrounding circumstances." *Id* at 88 (citations omitted). Thus, a creditor must demonstrate that (i) a debtor undertook a deliberate wrongful conduct without just cause or excuse and (ii) at the time he undertook the act, he intended for the injury to occur.

A determination of whether an injury qualifies as willful and malicious within the definition of § 523(a)(6) turns on Debtor's subjective intent to cause that injury and whether Debtor's conduct qualifies as malicious. See *Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998). To find implied malice, court need not find that Debtor subjectively harbored personal hatred, spite or ill will, but rather that Debtor's acts and conduct, given their context, are wrongful and without just cause or excuse. *In Re Stelluti*, 94 F.3d 84, 87 (2d Cir. 1996).

The court finds that Debtor's confessed embezzlement of up to $1,000 of cash strongly supports a finding of implied malice, as keeping cash that belonged to Plaintiffs was wrongful and without just cause or excuse. Further, the court finds that the injury following that embezzlement was certainly intentional. Debtor intended for Straight Line to suffer a loss equal to the amount of cash he willfully embezzled. The court finds that the higher amount Debtor confessed to embezzling, $1,000, is nondischargeable under § 523(a)(6). Additionally, the court finds the $1,000 debt to be nondischargeable under § 523(a)(4). "[S]ection 523(a)(4) excepts from discharge debts resulting from the fraudulent appropriation of another's property, whether the appropriation was unlawful at the outset, and therefore a larceny, or whether the appropriation took place unlawfully after the property was entrusted to the debtor's care, and therefore was an

embezzlement." *In re Scheller*, 265 B.R. 39, 53 (Bankr. S.D.N.Y. 2001) citing 4 L. King, COLLIER ON BANKRUPTCY ¶ 523.10 [2] at 523–77 (15th Ed. rev.1998).

From the testimony of comptroller Joe Dabroski, the court infers that Debtor further willfully and maliciously injured Plaintiffs by collecting partial payment on an account receivable owed by an employee and retaining it while reducing the account by $300, which caused a discrepancy in the account receivable later identified by Mr. Dabroski. This is a logical deduction based on the evidence before the court. Debtor's unusual behavior and refusal to attempt a reconciliation of his records in response to Mr. Dabroski's overtures coupled with Debtor's ready admission that he stole cash on several different occasions provides the basis for this court's conclusion. The court finds the $300 to be nondischargeable under Code § 523(a)(6) and, for the reasons stated above also nondischargeable under Code § 523(a)(4).

The only other evidence before the court that Debtor further willfully and maliciously injured Plaintiffs is Al Stage's testimony that he paid $17,500 cash directly to Debtor for several vehicles Mr. Stage purchased. Because these vehicles show as unpaid in Straight Line's records, Plaintiffs allege that Debtor stole the cash payments. Debtor completely denies that he received cash payments from Mr. Stage. The court does not find the testimony of Mr. Stage, in the absence of corroborating evidence, sufficiently persuasive or credible to find that Debtor received a $17,500 payment and kept it. Accordingly, no debt for this amount having been established, the claim of nondischargeability is denied. Plaintiffs' claim for damages of $17,500 under § 523(a)(4) and (a)(6) shall be separately dismissed.

**Conclusion**

For the reasons stated above, the court shall enter a separate judgment in the amount of $1,300 in favor of Straight Line finding that amount nondischargeable under § 523(a)(4) and (a)(6) and dismissing the balance of the claims.

So Ordered.

Dated: May 8, 2018                         Margaret Cangilos-Ruiz
      Syracuse, New York              United States Bankruptcy Judge