UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:  Adam M. Madigan,

                    Debtor.

Case No. 15-31545
Chapter 7

---

Straight Line, LLC, Jeffrey E. Barber,
Jean B. Barber, Emily J. Barber,
Paul T. Barber, and
Bethany A. Barber,

                      Plaintiffs,

  v.

Adam M. Madigan,

                    Defendant.

Adv. Proc. No. 16-50002

**FILED**

AUG 28 2020

OFFICE OF THE BANKRUPTCY CLERK
SYRACUSE, NY

Appearances:

James F. Selbach, Esq.
Selbach Law Firm, PLLC
290 Elwood Davis Road, Suite 290
Liverpool, NY 13088

*for Plaintiffs*

Peter A. Orville, Esq.
Orville & McDonald Law, PC
30 Riverside Drive
Binghamton, NY 13905

*for Defendant*

**Memorandum-Decision and Order on Motion for Summary Judgment**

In its May 8, 2018 judgment, this court held $1,300 nondischargeable under 11 U.S.C. §523(a)(4) and (a)6), for Debtor's embezzlement and conversion of funds constituting willful and malicious injury, but dismissed the balance of the $1.5 million in claims asserted under §523 (a)(2) for fraud. The underlying memorandum-decision incorporating the court's findings and conclusions found that Debtor had made fraudulent misrepresentations with the requisite scienter

but that Plaintiffs' reliance on Debtor's misrepresentations were not the cause of Plaintiffs' damages. (Doc. 55) ("Bankr. MDO").

On appeal, the district court vacated this court's judgment and in its written opinion of August 19, 2019, found that Debtor's fraudulent misrepresentations caused Plaintiffs' injuries in an amount up to their entire claim. (Doc. 68) ("Dist. MDO"). The district court remanded the matter which is now back before this court to determine the limited issue of the amount of Plaintiffs' $1.5 million loss that was caused by Debtor.[1]

Plaintiffs now move for summary judgment. (Docs. 86, 91) ("Motion"). They claim that there are no genuine issues of material fact in dispute and ask the court to find Debtor liable for $1,480,580.00 in damages. Plaintiffs filed a statement of material facts (Doc. 87) ("Statement of Facts"). Debtor opposes the Motion and objects to the Statement of Facts (Doc. 92) ("Opposition"), to which Plaintiffs replied. (Doc. 93).

**Factual and Procedural History**

The material facts are briefly summarized as follows.[2] Debtor filed a chapter 7 petition on October 23, 2015 and listed Plaintiffs as holding general, unsecured, non-priority claims of unknown amounts, and Jeffrey and Jean Barber as specifically owed $140,000.00, for a purported loan to purchase Debtor's home.

Plaintiffs own a majority share of State Line Auto Auction, Inc. ("State Line"), a family-owned wholesale automobile auction business in New York State. Plaintiffs formed the companion company, Straight Line, LLC ("Straight Line"), to provide floor plan financing to

---

[1] The district court did not address that portion of this court's Memorandum-Decision and Order of May 8, 2018, which found $1,300.00 nondischargeable pursuant to 11 U.S.C. §523 (a)(4) and (6). This memorandum-decision leaves intact the finding of nondischargeability of that separate debt, as reflected in the judgment which follows.
[2] The facts as previously found by this court (see Bankr. MDO at 3-16) and adopted by the district court (see Dist. MDO at 2-4), together with the exhibits in evidence are incorporated by reference.

2

automotive dealers, which enabled them, through the extended credit, to spend more money at State Line auctions. To finance vehicles purchased at auction, dealers would submit an application to open a line of credit through Straight Line. (Dist. MDO at 2; Bankr. MDO at 4-5).

Plaintiffs knew Debtor since his early youth. In October 2008, he was hired to work at State Line and assigned to Straight Line matters. After eight months of training, Debtor assumed the position of credit manager. (Dist. MDO at 2; Bankr. MDO at 3-4). As credit manager, Debtor was responsible for checking a dealer's outstanding borrowing against the pre-approved credit limit. Debtor would approve financing if the dealer had not exceeded its limit and authorize Straight Line to pay State Line in full for the purchased vehicles. It was the general rule that Straight Line, as the secured lender, would retain titles to the vehicles until they were sold by the dealer, at which time the dealer would remit payment to Straight Line, and Straight Line would release the title to the dealer. Debtor was also responsible for maintaining the files on each dealer and releasing vehicle titles upon payment, as well as performing credit checks on customers and tracking outstanding loans. (Bankr. MDO at 4-6).

Joseph and Chauncey Strevell (the "Strevells"), operating under the name Joe's Garage, began purchasing vehicles at State Line in March 2013. After four months of frequent purchases, the Strevells opened a $200,000.00 line of credit with Straight Line for purchases through Joe's Garage. (Bankr. MDO at 5-7). Within a month, Debtor allowed the Strevells to substantially exceed their $200,000.00 credit limit and, by the end of 2013, the Strevells owed Straight Line $609,205.00. *Id.* at 7. In 2014, the Strevells began financing vehicles through Straight Line through another entity, RJC Trading. *Id.* Debtor never established a credit line for RJC Trading, did not perform a credit check on RJC Trading and never required the Strevells to sign a financing agreement on behalf of RJC Trading. Debtor also routinely released vehicle titles to the Strevells

3

before they paid, which Straight Line only allowed under limited circumstances inapplicable to the Strevells. Throughout the two-year period during which the Strevells maintained a business relationship with Straight Line, Debtor never disclosed this information to Plaintiffs. *Id.* at 8.

The Strevells ultimately paid for all vehicles financed through Straight Line that had been purchased at auctions conducted through March 21, 2014. (Bankr. MDO at 9). However, beginning with the March 28 weekly auction, the Strevells purchased 16 to 23 vehicles weekly, with the one exception of May 23, when they purchased only two vehicles. *Id.* at 20. Jeffrey Barber conducted weekly meetings with his management team, including Debtor, every Monday. On multiple occasions during these weekly meetings in March, April and May of 2014, Jeffrey Barber asked Debtor about the Strevells. (Dist. MDO at 2-3; Bankr. MDO at 8-9, *referring to* 7-27 Trans. at 76:22-77:11; see also 7-26 Trans. at 107, 117, 146). Jeffrey Barber testified that he asked Debtor whether the Strevells were "ok," to which Debtor responded that the Strevells "paid like clockwork," and failed to disclose that the Strevells had consistently paid late, were well above their credit limit, never signed a credit agreement through RJC trading, nor that Debtor had been releasing titles without getting payment. *Id.*

In May 2014, Plaintiffs learned from an auction owner in Connecticut that the Strevells appeared to be legal risks. (Bankr. MDO at 9). Plaintiffs then investigated the Strevells' account and discovered that they had obtained numerous titles of vehicles from Plaintiffs without paying for them and without signing a written credit agreement. On May 23, 2014, Jeff Barber demanded that the Strevells sign new credit agreements for the amounts he believed they owed. The Strevells signed the credit agreements but never did business with Plaintiffs again. *Id.* at 9-10. During the period from March 21 through May 23, 2014, Debtor had released titles for 78 vehicles before receiving payment. (Bankr. MDO at 11; Dist. MDO at 3). Debtor then engaged in a cover-up by

4

falsifying business records and lying to Plaintiffs and police about how much the Strevells owed Straight Line. (Dist. MDO at 4). Debtor eventually pleaded guilty to nineteen misdemeanor counts of falsifying business records under Section 175.05 of the New York Penal Code, for which he was ordered to pay $23,000.00 in criminal restitution. (Bankr. MDO at 10).

The question now is how much of Plaintiffs' approximate $1.5 million loss was caused by Debtor's misrepresentations during the relevant period of March 28 to May 23, 2014. (Dist. MDO at 7-18). The District Court found that Plaintiffs did not establish an exact figure for the total amount of damages attributable to Debtor during the relevant period, and this limited issue concerning damages is back before this court. *Id.* at 18-20.

Following an initial hearing, the parties engaged in discovery and exchanged information as to the specific vehicles that were lost constituting Plaintiffs' damages. In a letter dated April 24, 2020, Plaintiffs assert that their total loss was $1,500,580.00. (Doc. 84) ("Letter on Damages"). Plaintiffs acknowledge receipt of $20,000 in partial reimbursement for their loss and assert that Debtor should be held liable for the remaining balance of $1,480,580.00. *Id.*

At a May 13, 2020 pre-trial conference, Debtor, through counsel, agreed to $1,480,580.00 as the total amount of Plaintiffs' unreimbursed damages. However, Debtor objects to Plaintiffs' assertion that Debtor should be held liable for the entire amount. Plaintiff subsequently filed the Motion at issue.

## Discussion

### *Scope of Remand*

The district court affirmed this court's findings that Debtor had made fraudulent misrepresentations with the requisite mental state of scienter, on which Plaintiffs had justifiably relied. The district court found that Debtor's fraudulent misrepresentations constituted a cause in

5

fact and a legal cause of Plaintiffs' damages. The district court remanded the case to determine the sole issue of how much of Plaintiffs' damages can be attributed to Debtor's fraud. (Dist. MDO at 18-19) ("However, what remains to be determined is how much of their $1.5 million loss was caused by Madigan's fraudulent misrepresentations.").

This court is strictly bound by the mandates of the district court, including its findings of fact and conclusions of law. The mandate rule, "compels compliance on remand with the dictates of the superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court." See *In re Fairfield Sentry Limited*, 539 B.R. 658, 672 (Bankr. S.D.N.Y. 2015) (citing *U.S. v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001)); see also *Doe v. New York City Dep't of Social Services*, 709 F.2d 782, 788 (2d Cir. 1983) citing *United States v. Cirami*, 563 F.2d 26, 32 (2d Cir. 1977) ("when an appellate court has once decided an issue, the trial court, at the later stage in the litigation, is under a duty to follow the appellate court's ruling on that issue."). On remand, this court will strictly adhere to the factual and legal determination of the district court and the parties have no leave to relitigate issues that have already been adjudicated.

*Standard for Summary Judgment*

Pursuant to Fed. R. Civ. P. 56, summary judgment is warranted only upon a showing that, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *In re Inflight Newspapers, Inc.*, 423 B.R. 6, 16 (Bankr. E.D.N.Y. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

*No Genuine Issues of Material Fact Exist*

In his Opposition, Debtor posits a series of rhetorical questions which, he argues, pose genuine issues of material fact that must be resolved at a hearing and, therefore, this matter is not

6

ripe for summary judgment. Plaintiffs argue that each relevant factual issue cited by Debtor has already been resolved sufficiently for summary judgment and that Debtor's remaining questions of fact are immaterial.

"A fact is material when a dispute over that fact would 'affect the outcome of the suit under the governing law,' and the resolution of a fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *In re Inflight Newspapers, Inc.*, 423 B.R. at 16 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). "In reviewing the record, the Court must resolve all ambiguities in favor of the nonmoving party." *Id.* (citing *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir.2004)). "The court is not to weigh the evidence, instead the Court must determine whether a genuine issue exists for trial." *Id.* (citing *Anderson*, 477 U.S. at 249).

"In order to defeat a summary judgment motion, the nonmoving party must present specific material facts and present sufficient evidence in support of them to show 'the existence of not just 'metaphysical doubt,'...but rather, a genuine dispute requiring resolution at trial.'" *Id.* (citing *Mitchell v. Senkowski*, 158 Fed. Appx. 346, 348 (2d Cir. 2005)); see also *In re Adler, Coleman Clearing Corp.*, 469 F.Supp.2d 112, 117 (S.D.N.Y. 2007) (holding that the court will grant summary judgment if it can be shown that, "little or no evidence may be found in support of the nonmoving party's case."). Summary judgment is also inappropriate when the nonmoving party "is incapable of presenting sufficient evidence to establish that material facts are genuinely in dispute because she's had an inadequate opportunity for discovery," in which case the court may deny summary judgment and grant a continuance for further discovery. *In re Inflight Newspapers, Inc.*, 423 B.R. at 16 (citing *Mitchell v. Senkowski*, 158 Fed. Appx. at 348).

By simply posing a series of questions, Debtor fails to present evidence to support his argument that there are genuine issues of material fact beyond metaphysical doubt. Debtor presents no evidence in his Opposition, relying instead on open-ended questions which he leaves the court to answer. Doing so is merely an attempt to conjure "metaphysical doubt," rather than pointing to genuine issues of material fact, and is insufficient, on its face, to overcome summary judgment. Nevertheless, the court considers each question in turn. In doing so, the court will not weigh the evidence but instead relies on the findings of the district court and reviews the record to determine if there is sufficient evidence such that a jury could return a verdict for Debtor.

First, Debtor asks when his misrepresentations occurred, when the meetings occurred where Debtor made the fraudulent misrepresentations, when the meetings and misrepresentations occurred in relation to the Strevells being overextended on their credit limit, and when Debtor improperly released titles to the Strevells. (Opposition at 10, ¶¶ 26-28). There is no issue of fact and no ambiguity in the record as to these questions. The meetings occurred on a weekly basis each Monday beginning before the relevant period. The relevant period began on Friday, March 28, 2014, and a meeting was held on Monday, March 24, 2014. Plaintiff Jeffrey Barber's unrebutted testimony established that he had asked Debtor about the Strevells during these meetings through March 2014, prior to the beginning of the relevant period, and that Debtor made misrepresentations at that time. The unrebutted testimony also shows that Debtor released titles every Friday. (Dist. MDO at 19, referring to Case No. 18-601-GLS, Doc. 7 at 12). Debtor does not rebut this testimony, nor does he offer any evidence to the contrary to establish a genuine issue of fact.

The record is also clear that the weekly meeting and, therefore, Debtor's mis-representations, as well as the release of titles, all occurred after the Strevells had surpassed their

8

credit limit. The unrebutted evidence shows that the Strevells had exceeded their credit limit by the end of 2013, at which time the Strevells owed Straight Line $609,205.00. (Bankr. MDO at 7, *referring to* Ex. 3 and Ex. C). The district court agreed (Dist. at 2-3), and Debtor is precluded from relitigating this issue.

Next, Debtor asks what constitutes an improper release of title, and what company policy he violated. (Opposition at 10, ¶¶ 28-29). Debtor fails to show how this question is material and related to the issue of damages. Moreover, the record is clear that Debtor violated numerous company policies including: (i) releasing titles to the Strevells without first having received payment for the vehicles (ii) allowing the Strevells to seriously exceed their credit limit (iii) failing to conduct a credit check and (iv) failing to have the Strevells sign a financing agreement. These determinations were already made by this court and affirmed by the district court. (Dist. MDO at 13-15). Debtor points to testimony from Emily Barber (Opposition at 10-11, ¶ 30) in attempting to relitigate these facts, which is improper and beyond the district court's mandate.

Debtor's remaining factual inquiries concern the issue remanded by the district court, namely, the apportionment of damages. Debtor broadly asks what portion of the damages, "if any," were caused by Defendant's fraudulent misrepresentation. (Opposition at 11). Debtor's insertion of "if any" implies that Debtor may not have caused any of Plaintiffs' damages. This suggestion runs afoul of the district court's holding that Debtor caused at least a majority of Plaintiffs' damages. As further discussed below, the record is clear as to the extent of damages caused by Debtor's fraudulent misrepresentations. Debtor asks what, if any, responsibility Plaintiffs share in causing their damages either through their actions or inactions. *Id.* at 11-12, ¶¶ 32-35, 41-47. Debtor also broadly asks what responsibility the Strevells had in contributing to Plaintiffs' damages. *Id.* at 11, ¶ 41. These are questions of law, addressed below.

9

The parties had extensive opportunity to engage in discovery both prior to trial and for the six months between issuance of the district court's decision and submission of the Motion. The court concludes that there are no genuine issues of material fact and this matter is ripe for summary judgment.

### *Debtor's Liability for Plaintiffs' Damages*

Plaintiffs contend that Debtor should be held liable for $1,480,580.00, which constitutes Plaintiffs' entire amount of damages of $1,500,580.00, less the $20,000.00 Plaintiffs have received to date. (Doc. 84). Debtor does not contest the calculation of Plaintiffs' total remaining damages ($1,480.580.00) but asserts that Debtor should not be held liable for the entire amount.

The court looks to state law to assess the substance of a claim. See, e.g., *In re Tompkins*, 391 B.R. 560, 563 (Bankr. S.D.N.Y. 2008) ("state law governs the substance of claims,") (citing *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20 (2000)). New York courts apply New York law to allocate tort damages where the parties had significant contacts with the forum. *Cooney v Osgood Machinery*, 81 N.Y.2d 66, 72 (N.Y. 1993). Here, Debtor filed for bankruptcy in New York, Plaintiffs' business is located in New York, Debtor lived and worked in New York prior to and during the relevant period, and Debtor's fraudulent misrepresentations occurred in New York. Additionally, both parties were domiciled in New York at the time Debtor filed for bankruptcy, the critical date for determining claims. See *In re Delta Air Lines, Inc.*, Case No. 05-17923, 2010 WL 423279, at *8 (Bankr. S.D.N.Y. Feb. 2, 2010) (citing 11 U.S.C. § 502(b) ("the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States *as of the date of the filing of the petition*,") (emphasis added). Therefore, the court applies New York law in allocating damages.

Based on the record and findings of the district court, the court agrees with Plaintiffs' contention that Debtor should be held liable for the entirety of Plaintiffs' remaining damages of $1,480,450.00, and that there is insufficient evidence in the record on which a reasonable jury could find otherwise.

The district court affirmed this court's finding that the relevant period for damages took place between March 28 to May 23, 2014, during which time the Strevells purchased cars from Plaintiffs without paying for them and were well in excess of their credit limit. The Strevells' criminal conduct is not disputed. The record is clear that the Strevells purchased vehicles every Friday—which, during the relevant period, included Friday, March 28, 2014, through Friday, May 23, 2014. The parties do not dispute the total number of cars the Strevells received or that the total damages are $1,500,450.00.

The district court affirmed this court's findings that Debtor made fraudulent misrepresentations by failing to fully respond to Plaintiffs' inquiries regarding the Strevells. (Dist. MDO at 5-6). The district court affirmatively held that by failing to fully respond to these inquiries, Debtor made misrepresentations rising to the level of fraud. Jeffrey Barber's uncontroverted testimony was that these meetings were held every Monday and that he had asked Debtor about the Strevells at these meetings in March, April and May of 2014. The district court held that Debtor's fraudulent misrepresentations caused Plaintiffs' damages during the relevant period. The record is clear that Debtor's fraudulent misrepresentations occurred prior to the relevant period during which Plaintiff incurred the entirety of the damages at issue. The uncontroverted evidence supports this finding.

Jeffrey Barber testified that had Plaintiffs known that the Strevells were receiving titles to vehicles when they were well over their credit limit, he would have "shut them off." (July 27 Tr.

11

78, 4-10). As a result, Plaintiffs would have been able to prevent the entirety of their damages during the relevant period had they known the truth about the Strevells and had Debtor not made the fraudulent misrepresentations.

The district court refers to a statement contained in Plaintiffs' appellate brief that a "majority" of the damages could have been prevented had Plaintiffs known the truth about the Strevells early in the relevant period. (Dist. MDO at 19, referring to Case No. 18-601-GLS, Doc. 7 at 12). In reviewing the district court's decision in light of the mandate rule, the district court did not make an affirmative finding that Debtor was not liable for the entirety of Plaintiffs' damages, but merely left open that possibility. Plaintiffs' statement merely illustrates the undisputed fact that they incurred damages over a period of time. At any point in time, Plaintiffs could have limited their damages if Debtor had told the truth. And, the earlier that Debtor would have told the truth, the more damages could have been avoided. Based on the evidence, Debtor's misrepresentations occurred well before the relevant period and prior to incurring any of the relevant damages. Based on these facts, and the district court's finding that Debtor's misrepresentations caused Plaintiffs' injuries, the court agrees with Plaintiffs that Debtor's misrepresentations caused all the relevant damages.

Debtor points out that he never issued titles to the Strevells after their first check bounced and after Plaintiffs learned that the Strevells had lied. (Opposition at 11, ¶ 31). This fact is not material to the court's analysis. The first check bounced in May 2014, days following the relevant period. The evidence establishes that Debtor stopped releasing titles to the Strevells only after the relevant period had ended—i.e., after the entirety of the damages had occurred and after Plaintiffs had uncovered Debtor's fraud. The fact that Debtor eventually stopped committing fraud has no bearing on the fact that his fraud caused the damages during the relevant period. Furthermore, the

12

district court found that Debtor's fraud caused Plaintiffs' damages during the relevant period which Debtor cannot now challenge.

Debtor argues that Plaintiffs failed to minimize or mitigate at least a portion of their damages. (Opposition at 11-12, ¶¶ 32-35). Debtor argues that Plaintiffs failed to do enough to prevent their damages when Jeffrey Barber discovered that the Strevells presented a credit because, at that time, Jeffrey Barber had the Strevells sign a credit agreement and authorized an increase in their credit limit up to the amount he believed they owed.

In New York, Plaintiffs have a duty to "minimize" their damages, which requires them to make a reasonable effort to reduce damages as the result of a wrongful act and precludes recovery for ensuing losses which could have been prevented by a reasonable effort. See 36 N.Y. Jur. 2d Damages § 127. "Mitigation" of damages is a similar but distinct concept. It is an affirmative defense whereby a defendant can show extenuating facts and circumstances that provide a basis for reducing the amount for which a defendant is liable. *Id.* It is an "unusual" defense which considers what reasonable steps, if any, a plaintiff could have taken subsequent to an incident giving rise to their injuries. *Id.* See, e.g., *Falk v Gallo*, No. 19472-06, 2008 WL 638419, at *4 (Sur Ct, Nassau County Feb. 25, 2008) ("A plaintiff must make a reasonable effort to mitigate damages.") (citing *Jewish Press, Inc. v. Willner,* 190 A.D.2d 841 (2d Dept 1993)). Plaintiffs need only employ a reasonable and proper effort, and it does not matter, in retrospect, if another, better means of limiting their liability had existed. 36 N.Y. Jur. 2d Damages § 127 (citing *New York Telephone Co. v. Harrison & Burrowes Bridge Contractors, Inc.*, 3 A.D.3d 606, 771 N.Y.S.2d 187 (3d Dept 2004); *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 47 A.D.3d 103, 846 N.Y.S.2d 95 (1st Dept 2007)).

13

Debtor fails to show, as a matter of law, that Plaintiffs failed to minimize or mitigate their damages. It has already been established that the entirety of Plaintiffs' damages occurred prior to Plaintiffs learning that Debtor had been releasing titles to the Strevells without a written agreement and at a time when they had exceeded their credit limit. Upon discovering this, Plaintiffs immediately conducted an investigation and, after an initial assessment of their damages, had the Strevells sign an agreement, after which business with the Strevells ceased. Plaintiffs attempted to deposit a check from the Strevells, which bounced. Jeffrey Barber testified that Plaintiffs had the ability to effect vehicle foreclosures but it was too late by that time. Debtor fails to plead any facts which show that Plaintiffs failed to take reasonable steps to mitigate or minimize their damages. That Plaintiff may have had other options is, as a matter of law, irrelevant to this inquiry. Debtor fails to show any unusual circumstances that would warrant a reduction in damages. Accordingly, the court rejects this defense as a matter of law.

Next, Debtor asserts that Plaintiffs may share some responsibility in contributing to their own damages. Debtor points out that the Strevells' business relationship with Plaintiffs began through Jeffrey Barber, that he "had to be aware that there were many weeks where the total purchases for that week totaled more than" the Strevells' credit limit, and that Plaintiffs had allowed the situation for the Strevells to purchase their vehicles. (Opposition at 12-13, ¶¶ 36-40). By these assertions, Debtor attempts to raise the defense of "unclean hands"

Under New York law, parties are said to have "unclean hands" where they participated in a course of conduct of deception and deceit, and the defense "rests on the premise that one cannot prevail in an action to enforce an agreement where the basis of the action is 'immoral and one to which equity will not lend its aid.'" See *Smith v Long*, 281 A.D.2d 897, 898 (4th Dept 2001) (citing *Muscarella v Muscarella*, 93 A.D.2d 993, 994 (4th Dept 1983)). The court notes that the defense

14

of unclean hands discussed in *Smith v. Long* concerned the enforceability of an agreement and did not involve damages arising from tortious conduct. See *Id.* at 723. Indeed, New York courts have held that the defense of unclean hands is unavailable to a defendant in an action to recover damages for fraud. *Greco v Christoffersen*, 896 N.Y.S.2d 363, 366 (2d Dept 2010). The defense is, therefore, unavailable to Debtor.

Even were the court to consider the factual basis of Debtor's defense of unclean hands, it would be rejected as a matter of law. Debtor pleads no facts that would give rise to such a defense. The fact that Jeffrey Barber began the business relationship with the Strevells and allowed them to do business is not reflective of any sort of deceit or immorality. Plaintiffs simply proceeded in the normal course of running a business. Debtor, as credit manager, served Plaintiffs in an important managerial position. It is uncontested that Debtor was responsible for monitoring the Strevells' account and served as a gateway for releasing titles and extending credit. Given his position of trust, Plaintiffs had a right to rely on him as the gatekeeper. Plaintiffs did business with the Strevells but all business ceased as soon as Plaintiffs learned of their fraud. Debtor fails, therefore, to show that Plaintiffs have unclean hands.

Debtor further argues that his damages should be reduced based on the Strevells' liability. (Opposition at 13, ¶ 41). This argument fails as a matter of law. New York law imposes joint and several liability, where liability imposed on joint tortfeasors is "indivisible," meaning "any one of the joint tort-feasors was liable to the injured party for the entire damage." See, e.g., *Hoffmann v. Horn*, 69 N.Y.S. 3d 686, 688 (2d Dept 2018). Under joint and several liability, Debtor can be held liable for the entire amount of damages caused by himself and his joint tortfeasors, the Strevells, as a matter of law.

15

New York law qualifies pure joint and several liability in certain circumstances which do not apply here. Article 16 of the New York Civil Practice Law & Rules ("N.Y.C.P.L.R.") modifies pure joint and several liability by limiting a joint tortfeasor's liability for *non-economic* damages to his or her proportionate share, provided that the joint tortfeasor's liability was 50% or less. See *Rangolan v County of Nassau*, 96 N.Y.2d 42, 46 (N.Y. 2001) (citing N.Y.C.P.L.R. 16). Here, it is undisputed that Plaintiffs' damages are solely economic, resulting from the loss of vehicles converted by the Strevells.

New York courts also recognize a limited exception where joint tortfeasors may not have acted in concert with each other. See, e.g., *Said v. Assaad*, 289 A.D.2d 924, 926 (4th Dept 2001) ("Certainly, a subsequent tort-feasor is not held jointly and severally liable for the acts of the initial tort-feasor with whom he is not acting in concert."). In such cases, a court may apportion damages between joint tortfeasors where a plaintiff's injuries are, "separate and distinct from one another." *Id.* However, that is not the case here. It is uncontroverted that the damages arose during the period March 28 through May 23, 2014, from the Strevells' conversion of vehicles as allowed by Debtor's fraud. Debtor's fraud, which took place prior to and during the Strevells' ongoing conversion of vehicles, caused Plaintiffs' damages at every instance during the relevant period. Debtor has failed to show that there were any damages caused by the Strevells that were not a result of Debtor's fraud Therefore, Debtor's argument must fail as a matter of law.

Next, Debtor asserts that his liability should be discounted based on Plaintiffs' own culpability, and that certain of the damages should be apportioned to Plaintiffs. (Opposition at 13, ¶ 41). Debtor specifically invokes the defenses of comparative negligence and assumption of risk, citing N.Y.C.P.L.R. §1411 (McKinney's Consolidated Laws of New York 2020) and *Lippes v Atlantic Bank of N.Y.*, 69 A.D.2d 127, 131 (1st Dept 1979). (Opposition at 13-16, ¶¶ 41-47).

16

It is well-settled that comparative negligence is no defense to an action in fraud. *Angerosa v White Co.*, 248 (4th Dept 1936) ("To deny relief to the victim of a deliberate fraud because of his own negligence would encourage falsehood and dishonesty."). New York courts have affirmatively and unequivocally held that the defenses contained in N.Y.C.P.L.R. §1411 are inapplicable to intentional torts. See *City of New York v. Corwen*, 164 A.D.2d 212 (1st Dept 1990) (reversed in part on other grounds); see also *Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 36 F.Supp.2d 560, 575–76 (E.D.N.Y. 1999) ("Contributory or comparative negligence is not a defense to fraud.") (citing *City of New York v. Corwen*, 164 A.D.2d 212). Fraud is an intentional tort, and the law in New York is clear that Debtor cannot invoke principles of comparative negligence or assumption of risk to reduce his own liability. Nevertheless, the record is devoid of any evidence that Plaintiffs contributed to their own damages and Debtor fails to plead any such facts. The court rejects this argument as a matter of law.

## Conclusion

Based on the foregoing, the court concludes that Debtor is liable for Plaintiffs' damages in the amount of $1,480,580.00. A separate judgment of nondischargeability shall issue in accordance with Fed. R. Bankr. P. 7058.

So Ordered.

Dated: August 28, 2020
Syracuse, New York

Margaret Cangilos-Ruiz
United States Bankruptcy Judge

17